J-S26026-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: D.G.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.L.D., MOTHER | |
| | No. 600 MDA 2021 |

Appeal from the Decree Entered April 9, 2021
In the Court of Common Pleas of Franklin County
Orphans' Court at 25-ADOPT-20

BEFORE:  STABILE, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MURRAY, J.:                    **FILED OCTOBER 06, 2021**

T.L.D. (Mother) appeals from the decree involuntarily terminating her parental rights to her son, D.G.D. (Child).[1]  Upon careful review, we affirm.

Child was born in July 2014.  Mother has been incarcerated since April of 2019, when Child was four years old, and Mother was arrested and charged with multiple felonies.  A year later, on April 23, 2020, Mother pled guilty to Criminal Conspiracy Engaging - Witness Intimidation; Intimidation of a Witness; Criminal Conspiracy – Aggravated Arson – Person Present; and

---

[1] The court involuntarily terminated the parental rights of Child's unknown father by separate decree entered the same day; no appeal was filed.

Criminal Solicitation – Murder of the First Degree.[2]  Orphans' Court Opinion, 4/9/21, at 4-5 (footnotes omitted); *see also* Petitioner's Exhibit 6.  As a result, Mother is serving a sentence of 9 – 30 years of incarceration.  N.T., 3/5/21, at 55.

On July 10, 2020, M.A., Child's maternal step-grandfather (Grandfather), and K.A., Child's maternal grandmother (Grandmother) (collectively, Grandparents), filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

The orphans' court held a hearing on March 5, 2021, during which Kevin Taccino, Esquire, represented Child's legal and best interests.  Grandparents testified and introduced seven exhibits into evidence.  Mother testified by video from the State Correctional Institution (SCI) Cambridge Springs.

Child had lived with Mother until her incarceration in April 2019.  N.T., 3/5/21, at 37; Petitioners' Exhibit 6.  Prior to that time, Grandparents babysat Child three or four times a week, and on occasion, up to a week at a time.  *Id.* at 6, 37.  Grandfather testified that Child began residing with him and Grandmother on May 3, 2019.  *Id.* at 5.  By order dated June 12, 2019,

---

[2] "The intended victim in the arson and murder charges [was] the person [Mother] claims is [Child]'s biological father, despite DNA evidence to the contrary.  Her accomplice in the witness intimidation case is her daughter, [K.]."  Orphans' Court Opinion, 4/9/21, at 5.  At the time of the termination hearing, K. was 22 years old.  N.T., 3/5/21, at 11.  Mother acknowledged K. was her co-defendant "in the intimidation case."  *Id.* at 56

Grandfather and Grandmother were awarded shared legal and physical custody of Child. Petitioners' Exhibit 3.

At the conclusion of testimony, Attorney Taccino advocated for termination. N.T., 3/5/21, at 61-63. He explained, in part, that Child, "indicated to me that he didn't remember much about living with [Mother and] . . . liked living with his grandparents. I had asked him how long he wanted to live there. He wanted to live there forever." *Id.* at 61.

On April 9, 2021, the orphans' court issued the decree involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b), along with an opinion. On May 7, 2021, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The court filed a Rule 1925(a) opinion on May 24, 2021, in which it referred this Court to the decree and accompanying opinion entered April 9, 2021.

On appeal, Mother presents the following question for review:

Whether the [orphans'] court's decision to terminate Mother's parental rights was supported by clear and convincing evidence and did not constitute an abuse of discretion[?]

Mother's Brief at 5.

The Pennsylvania Supreme Court has explained that our standard of review,

requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

- 3 -

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

We further recognize that termination involves a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Pertinently, the law provides:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the

control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1), (b).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)).

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Id.* (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)).

Our Supreme Court, in *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), where the Court considered termination of parental rights of incarcerated parents in the context of abandonment, which is currently codified in Section 2511(a)(1). The Court explained:

> Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect

- 5 -

and support his child and to make an effort to maintain communication and association with that child." *Id.* at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

*In re Adoption of S.P.*, 47 A.3d at 828. The Court continued:

[A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. **Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.** Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

[*McCray*] at 655 (footnotes and internal quotation marks omitted). . . .

*In re Adoption of S.P.*, *supra* (emphasis added); *see also In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted) (stating a parent does not perform parental duties by displaying a "merely passive interest in the development of the child").

With respect to Section 2511(b), this Court has stated that intangibles "such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The orphans' court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of

any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted). In weighing bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***In re T.S.M.***, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id***.

Instantly, Mother contends Grandparents failed to prove by clear and convincing evidence that her conduct warranted termination under Section 2511(a)(1). Mother asserts she "took what steps she could to maintain a parental presence in Child's life." Mother's Brief at 11. She argues the orphans' court failed to consider her "explanations of her efforts and limitations or the totality of the circumstances," and "placed unrealistic expectations" on her. ***Id.*** at 13-14. For instance, Mother states the court should not have expected her "to continuously repeat efforts, such as telephone calls, that had failed in the past." ***Id.*** Mother also states that the court "cannot hold [her] responsible for inconsistent and unreliable mail delivery, especially during the COVID-19 pandemic of 2020." ***Id.*** at 14. We are not persuaded by Mother's argument.

The relevant statutory language specifies grounds for termination when the "parent **by conduct continuing for a period of at least six months**

**immediately preceding the filing of the petition** either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1) (emphasis added). Here, Grandparents filed the termination petition on July 10, 2020, and notice was provided to Mother on July 20, 2020. The orphans' court expressly credited Grandparents' testimony that Mother "made little to no attempt to contact Child in [the] year and three months" that she was incarcerated **prior** to the filing of the termination petition. Orphans' Court Opinion, 4/9/21, at 7. The court explained:

> We further find credible the testimony that no attempts were made to contact [C]hild until **after** the instant [p]etition was filed. The exhibits provided by [Grandparents] demonstrate that the first letter sent to [Child] from [M]other was August 1, 2020. ... We also find credible the assertion that [Grandparents] received one telephone call from [Mother], but it was a call that had been missed by them. There have been no other telephone calls.

> Conversely, we find [Mother]'s testimony that she made multiple attempts to call [Child] from jail or prison to be not credible. We also find [Mother]'s explanation that she could not send cards or letters from Franklin County Jail to be mere excuses for her inattention, as she was sufficiently able to contact the Public Defender's Office and the District Attorney's Office during her incarceration there.

> We also find credible testimony that [Mother] has not provided any sort of support for [Child], either in terms of financial support, or any other form of parental support. …

*Id.* at 7-8 (emphasis added).

Grandparents testified that prior to their filing of the termination petition, Mother did not contact them or Child. N.T., 3/5/21, at 9-11, 27-28.

After Grandparents filed the petition, Mother wrote letters to Child and mailed them to Grandparents' house. *Id.* at 10, 28; Petitioners' Exhibit 7. Also, after the petition was filed, Mother placed one missed telephone call to Grandmother. *Id.* at 10, 27-28.

Mother was first incarcerated in the Franklin County Jail, then transferred to SCI Muncy, and then to SCI Cambridge Springs. N.T., 3/5/21, at 38. Mother testified she was transferred from county to state prison on May 21 or 22, 2020. *Id.* at 42. Contrary to Grandparents' testimony, Mother testified she telephoned Grandmother "several times" from Franklin County Jail. *Id.* at 37-38. She also testified, "I also asked my daughter, [K.,] to call." *Id.* at 37. Grandparents testified that K. never contacted them about Child. *Id.* at 11, 28.

Regarding letters, Mother testified, "I couldn't do letters because I didn't have money for envelopes. They didn't give free envelopes in county." *Id.* at 37. However, Mother also testified that while incarcerated in Franklin County Jail, she asked K. "for money and [I] had to get a few envelopes off of people to write the district attorneys and stuff like that." *Id.* at 43.

Mother stated her attempts to contact Child after leaving the Franklin County Jail consisted of "probably one or two" telephone calls. *Id.* at 39. Mother testified she "sent letters out about the same time that I got the [involuntary termination] paperwork[.]" *Id.* Mother conceded she has not provided financial support to Child since her incarceration. *Id.* at 46.

Concerning her efforts to have a relationship with Child, Mother responded on cross-examination as follows:

> Q. And is it your testimony that you've done everything you can to have a relationship with [Child] while you've been incarcerated?
>
> A. I can't say everything but I'm trying, but I'm not getting a response.

*Id.* at 47.

Finally, the documentary evidence shows Mother's letters to Child were dated after she was notified of the termination petition. *See*, *e.g.*, Petitioners' Exhibit 7. Thus, Mother's assertion that she has been held "responsible for inconsistent and unreliable mail delivery" is belied by the record. Mother's Brief at 14.

In sum, the record refutes Mother's claim that "she testified credibly to her attempts to contact Child from both Franklin County Jail and State Correctional Institutes," Mother's Brief at 11, and provides clear and convincing evidence that termination was warranted under Section 2511(a)(1). As the orphans' court explained,

> Essentially, [Mother] has been absent from [Child]'s life since becoming incarcerated on [attempted] murder, arson and intimidation charges. Although incarceration makes the ability to provide support difficult, we are mindful of the fact that many incarcerated individuals have children and find some way to support them. We find none here. Moreover, we find that [Mother]'s conduct in conspiring to murder the man she insists is the father of the child despite objective proof to the contrary to be evidence of her prioritization of the "drama" in her life over the needs of her own child. [Mother] has failed to exert herself to fashion a place of importance in [C]hild's life and provide for not only financial and physical needs, but also such intangible needs

- 10 -

as love, solace and affection that would enable her to maintain a bond with [C]hild in spite of her incarceration.

Orphans' Court Opinion, 4/9/21, at 8.  We discern no error.

With respect to Section 2511(b), Mother argues the orphans' court abused its discretion by failing to consider her testimony that when she was a child, she suffered mental and physical abuse by Grandfather.  She asserts, "Any breakdown in the parent-child relationship was caused by [Grandparents], who admitted under testimony that they refused to provide any of Mother's letters to Child."  Mother's Brief at 15.

Mother responded to direct examination as follows:

Q. Do you have any concerns about [Child] residing with [Grandparents]?

A.  Unfortunately I do.  My stepdad is the one that controls everything in the house.  My mother just sits back, and I see that she's rolling her eyes unfortunately.  It is true.  It's what he says goes.  And I don't even know where my child is sleeping at.  The last time I knew he was either sleeping with my stepdad.  One time sleeping with my mom next.  At least if he is with my daughter, [K.], he will have his own room.

. . .

Q. Is it your understanding [Child] does not have his own room with [Grandparents]?

A.  Correct.  The last time I knew he did not.

Q. Are there any other concerns that you have about him residing with them?

A.  My stepdad was mentally and physically abusive to me when I was a kid.  He does not like me for some reason.  That's why they took custody of my son when I was put in jail.  ...  [M]y gut tells

me I just don't trust my stepdad. It's just the way I feel. It's the way it's always been.

Q. [I]s there anything else that you would like the judge to know?

A. I'm doing what I can to get out. I'm doing what I need to in here. I'm doing my programs. I'm doing everything that they want me to do. I would just prefer that my son be with my daughter, [K.].

N.T., 3/5/21, at 40-41.

In contrast to Mother's testimony, the orphans' court concluded:

[Child] is well cared for and loved in [Grandparents'] home. He is fed, clothed and sheltered by them. They look out for his welfare and provide for his medical needs in addition to therapy to help him deal with the trauma in his life. They send him to private school at which he performs well. They fulfill the roles of not only his grandparents but his parents. They see to it that his needs are well met. We find credible their testimony that a deep bond of love, affection and safety exists between [Grandparents] and [Child].

Orphans' Court Opinion, 4/9/21, at 9. Again, the record supports the determinations of the orphans' court.

On cross-examination by Mother's counsel, Grandfather testified he helped Grandmother raise Mother, and did not use corporal punishment. N.T., 3/5/21, at 20. Likewise, he does not use corporal punishment with Child. *Id.* at 19. Rather, in disciplining Child, Grandfather testified, "[u]sually we'll take some things away from him, and then we'll sit down and talk with him, explain to him about what he did wrong[, and] about doing the right things and things like that[.]" *Id.* at 19-20.

- 12 -

Grandfather further testified that when Child lived with Mother, Child's relationship with Mother "was really negative. He did not like being with her." *Id.* at 14. Grandfather described his relationship with Child as "great." *Id.* at 15. He affirmed on direct examination that he and Grandmother have a parent-child bond with Child. *Id.* at 15-16. He also opined that Child will not be negatively affected by termination because, "Like I said, he doesn't want anything to do with her." *Id.* at 18. Grandfather responded to questioning during the following exchange:

Q. Since you obtained custody of [Child], has he asked about seeing his mom?

A. A few times on rare occasions he would mention something, but it was always in a negative way he would talk about her.

Q. Did he . . . say he wanted to talk to her or see her?

A. No.

Q. Do you know roughly when the last time that he mentioned her was?

A. I believe the last time was an incident where a little boy at school told [Child] that his mommy was going to get out of prison and come get him, and he told us that, and he says I don't want to go with her. She's mean to me. She lies to me and she lets me [be] with people I don't like.

Q. Did you see any change in [Child] after that conversation?

A. Yes. He started wetting the bed at night. He started getting out of bed and not staying in bed when we put him in, and this lasted for about a month or so. We kept reassuring him that wasn't going to happen and how much we loved him and everything else, and it finally did stop.

*Id.* at 12-13.

- 13 -

Grandmother affirmed in her testimony that Child regressed "when there w[ere] conversations about his mom getting out of jail and getting him." *Id.* at 29-30. She also opined that Child has a negative relationship with Mother, stating, "when [Mother] would come to get him [from Grandparents' house when Grandparents were babysitting] . . . he wouldn't want to give her a hug or anything. [H]e didn't want anything to do with her." *Id.* at 29. Grandmother testified that adoption is in Child's best interests because "he needs structure[.] [H]e needs love. He gets all of that [with Grandmother and Grandfather]." *Id.* at 31.

The orphans' court credited the testimony of Grandfather and Grandmother as to Child's needs and welfare. Based on our review of the record, there is no support for Mother's assertion that any "breakdown in the parent-child relationship was caused by [Grandparents.]" Mother's Brief at 15. To the contrary, the record indicates there was little if any parent-child bond, and supports the orphans' court's finding that termination was consistent with Child's best interests. *In re C.M.S.*, 884 A.2d at 1287. Accordingly, we affirm the termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/6/2021